[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 12-11818

D.C. Docket No. 1:09-cv-02210-KOB-TMP

TREVIS CALDWELL,

Plaintiff-Appellant,

versus

WARDEN, FCI TALLADEGA,
UNIT MANAGER,
LIEUTENANTS,

Defendants-Appellees.

Appeal from the United States District Court for
the Northern District of Alabama

(April 7, 2014)

Before HULL, Circuit Judge, and GOLDBERG,[*] Judge, and SMITH,[**] District
Judge.

---

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge,
sitting by designation.

HULL, Circuit Judge:

While incarcerated at FCI-Talladega in Alabama, plaintiff Trevis Caldwell was assaulted and stabbed by his cellmate, Jeremy Pinson.  Caldwell brought a pro se Bivens[1] action against three federal prison officials—defendant William Elston, the Unit Manager at FCI-Talladega, and defendants Vernessa Williams and Wilbert Davis,[2] lieutenants at FCI-Talladega—for their alleged deliberate indifference to the substantial risk of serious harm that inmate Pinson posed to plaintiff Caldwell.

The district court granted summary judgment in favor of the three defendants.  After review of the record and the briefs of the parties, and having the benefit of oral argument, we vacate the district court's judgment and remand for further proceedings.

---

[**] Honorable C. Lynwood Smith, Jr., United States District Judge for the Northern District of Alabama, sitting by designation.

[1] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 395–97, 91 S. Ct. 1999, 2004-05 (1971).

[2] The defendants' names are spelled in various ways throughout the district court docket. The correct spellings of the defendants' names were eventually clarified.  We use the corrected spellings in this opinion.

# I.  FACTUAL BACKGROUND

Because the defendants moved for summary judgment, we present the facts in the light most favorable to plaintiff Caldwell, construing all reasonable inferences in his favor.[3]

## A.    Special Management Unit

The events giving rise to this case occurred in the Special Management Unit at FCI-Talladega in Alabama ("SMU").  The SMU is a non-punitive unit for very disruptive inmates who require greater management to ensure the safety, security, and orderly operation of federal prisons.  The SMU houses high security inmates from other prisons throughout the federal prison system.

## B.    Inmate Pinson

In April 2009, inmate Pinson was housed at FCI-Coleman in Florida. Inmate Pinson had a "history of serious disciplinary infractions which ha[d] not been controlled through the disciplinary process in a High level [federal prison] facility."  Because of inmate Pinson's violent behavior, the unit manager at FCI-Coleman wrote a letter to his prison's warden recommending Pinson's placement in a SMU "to ensure the safety and security of the institution."  To support his

---

[3]Because Caldwell may not be able to prove such reasonable inferences to the satisfaction of the jury, the facts we recite may ultimately turn out not to reflect the true facts of the case.

written recommendation, the unit manager listed numerous incident reports that inmate Pinson received from 2007 through April 2009, some of which included assaults on inmates and staff that resulted in serious and minor injuries.[4]

The warden at FCI-Coleman approved the request to refer Pinson to the SMU.  On August 6, 2009, inmate Pinson arrived at the SMU at FCI-Talladega.

No one disputes that employees at the FCI-Talladega SMU are aware that SMU inmates are sent to the SMU specifically because they have been violent and disruptive at other federal prisons.  Indeed, the Bureau of Prisons's SMU policy states that the SMU unit team reviews for behavioral improvement (i.e., compliance with SMU program rules and cessation of violent and disruptive behavior) every 30 days.

As employees of the FCI-Talladega SMU, defendants Elston, Williams, and Davis knew that inmate Pinson's violent past resulted in his placement in the

---

[4]The specific incidents referenced in that recommendation letter were disruptive conduct – high; assault with serious injury; assault without serious injury (12 times); threatening bodily harm (5 times); fighting with another person; possessing a dangerous weapon (2 times); adulterating food or drink; destroying property; refusing to obey an order; and insolence to staff (2 times).

4

SMU.  And, in his declaration, plaintiff Caldwell stated that the three defendants knew of inmate Pinson's "violent past that got him to the S.M.U. placement."[5]

## C.    Plaintiff Caldwell

In June 2009, plaintiff Caldwell was housed at USP-McCreary in Kentucky. After a fight with inmates in the recreation yard, Caldwell was also referred for placement in the SMU.  The warden at USP-McCreary recommended Caldwell's transfer to the SMU based on Caldwell's "history of serious and/or disruptive disciplinary infractions."[6]

On August 18, 2009, Caldwell arrived at the SMU at FCI-Talladega. Caldwell was assigned to share a cell with inmate Pinson (who had arrived on August 6).

## D.    Unit Manager Elston's Statement

On Friday, September 4, 2009—shortly after Caldwell was assigned to be inmate Pinson's cellmate at the FCI-Talladega SMU—inmate Pinson told

---

[5]The defendants did not move to strike plaintiff Caldwell's 54-page declaration in the district court nor did they object to it on appeal.

[6]Unlike the record evidence related to inmate Pinson's prior violent history (see note 4), the record does not reflect the specific prior incidents leading to plaintiff Caldwell's transfer to the SMU.

defendant Elston that he did not want a cellmate.  According to inmate Pinson, defendant Elston replied, "Kill him.  I don't care.  I go home at 4:00 p.m."[7]

### E.    Cell Fire on September 9

Sometime before 10 a.m. on September 9, 2009, inmate Pinson started a fire in the cell he shared with plaintiff Caldwell while both men were locked in the cell. Plaintiff Caldwell played no part in starting the fire.

When the cell's fire alarm activated, defendants Elston and Williams, and two other correctional officers, responded.  Because the sprinkler system was inoperable, the cell filled with flames and black smoke.  The fire was concentrated at the cell's locked door but was also in the cell's light fixture and sink.  Plaintiff Caldwell's personal property, including his personal photographs, address book, and legal materials, were also burning inside the cell.

The responding prison personnel handcuffed plaintiff Caldwell and inmate Pinson, removed them from their cell, strip searched them, and placed them in "full chain body restraints."[8]  Inmate Pinson freely told defendants Elston and Williams that he set the fire and that Caldwell "had nothing to do with it."  As a result of the

---

[7]Because our analysis in this opinion turns on whether the knowledge shared by all three defendants is sufficient to survive summary judgment, we do not rely on defendant Elston's alleged September 4 conversation with inmate Pinson.

[8]The record does not indicate how much time passed after Pinson ignited the fire but before prison personnel rescued Caldwell and inmate Pinson from their fiery cell.

6

fire and the efforts to extinguish it, "a large amount of [plaintiff Caldwell's] personal property items [inside the cell] were either destroyed and/or damaged to the point of being unidentifiable and/or unusable."

Prison medical staff examined plaintiff Caldwell to assess the injuries he sustained when he was removed from the cell during the fire. The record does not contain the results from this medical assessment. However, the record does indicate that Caldwell injured his knee while exiting the fiery cell.

After plaintiff Caldwell's medical examination, defendant Elston instructed a correctional officer to return Caldwell to the cell with inmate Pinson.

**F.    Caldwell's Fear of Returning to His Cell**

Prior to being returned to his cell, plaintiff Caldwell verbally told defendants Elston and Williams that he "was in fear for his life if he was placed in the same cell with Pinson" and that he could not be returned to the same cell as inmate Pinson. In response, Elston and Williams "smiled [and] shrugged their shoulders" but otherwise ignored Caldwell's safety concern.

Plaintiff Caldwell also verbally told defendant Davis that he feared that his life was in danger if he was returned to the same cell as inmate Pinson. Davis responded by telling Caldwell to "deal with it" but otherwise ignored Caldwell's safety concern.

7

In a declaration produced in response to Caldwell's complaint, defendant Elston stated, "If inmate Caldwell had expressed any concerns to me about his safety, I would have made sure he was not placed back with his cellmate." Similarly, defendant Williams stated in a declaration, "If inmate Caldwell had made any statement which would have indicated he was in any danger, he would have been secured away from [inmate Pinson]." And, defendant Davis stated in a declaration, "If inmate Caldwell had expressed any concerns to me about his safety, I would have notified my supervisor, and I would have made sure he was not placed back with his cell-mate unless the concerns were resolved."

Thus, the defendants acknowledge that they would not have returned plaintiff Caldwell to the cell with inmate Pinson if plaintiff Caldwell had expressed any concerns for his safety. Rather, the defendants contend that plaintiff Caldwell expressed no such concerns. But, at this summary judgment stage, we must accept as true plaintiff Caldwell's sworn statement that he told the defendants that he feared for his safety and his life if he was returned to the cell with inmate Pinson.

## G.    Lack of Investigation or Risk Minimization

Before returning plaintiff Caldwell to the locked cell with inmate Pinson, neither the defendants nor anyone else investigated how inmate Pinson started the fire, why Pinson started it, whether Pinson could readily endanger Caldwell's life a

8

second time, whether Pinson intended to harm Caldwell in particular or any assigned cellmate in general, whether Pinson was mentally stable, or any other mental-capacity or safety-related matter.

Furthermore, there is no indication that the defendants did anything to assess the items or circumstances that could allow inmate Pinson to harm Caldwell in the future. For example, the record reflects that inmate Pinson had access to an 8.5" shank. And, the record reflects that the cell's sprinkler system did not work and that flammable materials remained in the shared cell even after the fire. Nevertheless, Caldwell was returned to the cell within hours of inmate Pinson starting a fire in that very cell.

## H.    Inmate Pinson's Attack on September 10

Sometime before 9:00 a.m. on the morning after the fire, plaintiff Caldwell was in his cell reading a book when inmate Pinson placed Caldwell in a choke-hold until Caldwell passed out. When Caldwell regained consciousness, he discovered that he was on the floor and that his hands and feet were bound with fabric. Caldwell was bleeding from his nose and from a gash on his head.

Inmate Pinson held an 8.5" shank, with a handle made from cloth, and yelled through the cell door that he was going to kill Caldwell. After approximately 90

9

minutes of hostage negotiations with prison staff, inmate Pinson agreed to submit to restraints.  Thereafter, prison guards removed Caldwell from the cell.

Medical personnel examined Caldwell.  As part of his medical exam, Caldwell received a CAT scan for possible head trauma and an evaluation for possible sexual assault.  Caldwell had puncture wounds and cuts on his head and chest; contusions on his scalp, forehead, nose, cheek, and neck; lacerations on his chest; and abrasions to his wrists, ankles, left knee, and right shin.  The record does not contain results from Caldwell's CAT scan or sexual assault evaluation.

## I.    Post-Attack Debriefing

Following inmate Pinson's attack on plaintiff Caldwell, SMU personnel generated numerous reports summarizing the attack, their response to the attack, and other pertinent information.  In a memorandum produced the day of the attack, an FCI-Talladega Captain G. Smith, summarized his use-of-force team's response to inmate Pinson's attack.  In that report, Captain Smith stated that inmate Pinson "was very disruptive" and had "an extensive well documented history of disruptive and assaultive behavior" that was having "a major impact on the orderly running of the Institution as well as the safety of both Staff and inmates."

10

## II.  PROCEEDINGS IN THE DISTRICT COURT

### A.    Caldwell's Sworn Complaint

In October 2009, Caldwell filed a pro se Bivens action against defendants Elston and Williams.  In January 2010, Caldwell amended his sworn complaint to add defendant Davis and to clarify his factual allegations.[9]  In his sworn complaint, Caldwell alleged, inter alia, that the three defendants were deliberately indifferent to the substantial risk that inmate Pinson posed to plaintiff Caldwell's safety through their failure to protect Caldwell from inmate Pinson.  Caldwell sought compensatory and punitive damages.[10]

On April 28, 2010, after screening Caldwell's complaint pursuant to the Prison Litigation Reform Act,[11] the district court dismissed all claims against the defendants other than Caldwell's Eighth Amendment claim that the defendants failed to protect Caldwell from the risk posed by inmate Pinson.  The district court

[9]Caldwell originally named other defendants; however, the district court dismissed those defendants.  Caldwell does not appeal that decision from the district court.

[10]Caldwell also sought injunctive relief to enjoin the defendants from placing him in the SMU with inmate Pinson.  The district court denied that request, and Caldwell does not appeal that decision.

[11]The PLRA requires the district court to screen complaints filed by prisoners against officers or employees of governmental entities and dismiss the complaint or any portion of the complaint that is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.  See Jones v. Bock, 549 U.S. 199, 213-14, 127 S. Ct. 910, 920 (2007).  Thus, under 28 U.S.C. § 1915A, the district court may sua sponte dismiss a prisoner's complaint or any portion of the complaint for any of those four reasons prior to service of process.

then referred Caldwell's failure-to-protect claim to the magistrate judge for further proceedings.

## B.    Order to File a Special Report

The magistrate judge directed the defendants to review and respond to the factual allegations supporting plaintiff Caldwell's failure-to-protect claim.  The magistrate judge directed the defendants to provide a Special Report that included sworn statements describing each defendant's knowledge of the incident, a list of all other persons with knowledge of the facts related to the claim, and all documents relevant to the claim or any subsequent investigation undertaken with respect to that claim.  The magistrate judge required plaintiff Caldwell to make similar disclosures.

The magistrate judge forbade additional discovery without express leave of the court.

## C.    Summary Judgment Evidence

In response to the magistrate judge's order, the defendants submitted a 24-page Special Report that articulated factual and legal arguments against plaintiff Caldwell's failure-to-protect claim.  The defendants attached ten documents to this Special Report, including affidavits and declarations from the defendants and other prison employees, internal Bureau of Prison memoranda, and several investigation

12

reports and files related to inmate Pinson's September 2009 assault on plaintiff Caldwell.

Thereafter, plaintiff Caldwell filed a 54-page declaration that recited Caldwell's version of events leading up to inmate Pinson's September 2009 assault and contained evidence of Caldwell's prison grievances.  Significantly, Caldwell's declaration expressly directed the magistrate judge to specific evidence, contained in the attachments to the defendants' Special Report, that supported Caldwell's claim.

**D.    Defendants' Summary Judgment Motion**

After receiving the defendants' Special Report and plaintiff Caldwell's response, the magistrate judge construed the defendants' Special Report as a motion for summary judgment and construed Caldwell's sworn declaration and evidentiary filings as an opposition to the defendants' motion.

In their construed motion for summary judgment, the defendants argued that they were entitled to qualified immunity because they did not violate Caldwell's constitutional rights.  The defendants did not argue, in the alternative, that they were entitled to qualified immunity because the law did not clearly establish that their alleged actions, if proven, were unconstitutional.

13

**E.    Magistrate Judge's Report and Recommendation**

On January 20, 2012, the magistrate judge issued a report and recommendation ("R&R") that the defendants' motion for summary judgment be granted.  The magistrate judge's R&R contained only a one-paragraph recitation of the facts and events that led to inmate Pinson's assault on plaintiff Caldwell.   In that paragraph, the magistrate judge relied on plaintiff Caldwell's verified amended complaint and did not his cite any of the more than 85 pages of summary judgment evidence.

After the abbreviated recitation of the facts in his R&R, the magistrate judge agreed with the defendants that their conduct did not violate Caldwell's Eighth Amendment rights.[12]  Specifically, the magistrate judge stated that the summary judgment evidence did not support the inference "that the defendants were aware of a 'particularized threat or fear' experienced by the plaintiff" and, therefore, could not have been "deliberately indifferent to a known danger to [plaintiff Caldwell]."

The magistrate judge did not expressly state that the defendants were entitled to qualified immunity.  Consistent with the defendants' failure to raise any clearly-

---

[12]The magistrate judge also found that Caldwell "exhausted his administrative remedies." The defendants have not challenged this ruling on appeal.

14

established argument in its summary judgment motion, the magistrate judge did not discuss in his R&R whether the law clearly established that the defendants' actions were unconstitutional.

## F.    District Court's Order

On February 15, 2012, the district court adopted the magistrate judge's R&R and granted the defendants' motion for summary judgment.

### III.  PROCEEDINGS ON APPEAL

Plaintiff Caldwell, still proceeding pro se, filed a brief in this Court.  In response, the defendants argued, as they had in the district court, that they were entitled to qualified immunity because their actions did not violate Caldwell's constitutional rights.

This Court sua sponte appointed counsel to represent plaintiff Caldwell on appeal and directed Caldwell's appointed counsel to file a supplemental brief on Caldwell's behalf.  In their response to Caldwell's counseled supplemental brief, the defendants reiterated that they were entitled to qualified immunity because their actions did not violate Caldwell's constitutional rights.  And, for the first time in this case, the defendants asserted that they were entitled to qualified immunity on the alternative ground that the law did not "clearly establish" that their actions were unconstitutional.

15

## IV.  STANDARD OF REVIEW

Because Caldwell proceeded pro se in the district court, we liberally construe his pleadings.  Trawinski v. United Techs., 313 F.3d 1295, 1297 (11th Cir. 2002).  We also credit the "specific facts" pled in plaintiff Caldwell's sworn complaint when considering his opposition to summary judgment.  Perry v. Thompson, 786 F.2d 1093, 1095 (11th Cir. 1986) ("Plaintiff alleged specific facts in his sworn complaint and they were required to be considered in their sworn form."); Sammons v. Taylor, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[F]acts alleged in an inmate's sworn pleading are sufficient and . . . a separate affidavit is not necessary.").

In reviewing a district court's grant of summary judgment, we view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.[13]   Rodriguez v. Sec'y for Dep't of Corrs., 508 F.3d 611, 616 (11th Cir. 2007).  Summary judgment is appropriate when the evidence, viewed in the

---

[13]In their initial response brief on appeal, the defendants acknowledge that we review de novo the district court's factual findings and legal conclusions.  The defendants argued for the first time in their supplemental response brief that this Court should review the facts recounted in the magistrate judge's R&R only for plain error because plaintiff Caldwell did not object to the R&R.  See Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1308 (11th Cir.), cert. denied, 134 S. Ct. 655 (2013).  Caldwell asserts that he never received the R&R.  We need not decide whether de novo or plain error review applies because the magistrate judge's failure to consider any of the more than 85 pages of summary judgment evidence in the merits portion of his R&R constituted plain error in any event.  See id.

light most favorable to the non-moving party, "presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." Owusu-Ansah v. Coca-Cola Co., 715 F.3d 1306, 1307 (11th Cir.), cert. denied, 134 S. Ct. 655 (2013).

## V.  QUALIFIED IMMUNITY

The defendants assert that that they are not liable under the Eighth Amendment because they are entitled to qualified immunity.

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002)).  "To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Id. at 1234.

Caldwell concedes that the defendants were acting "within the scope of [their] discretionary authority," so he bears the burden to show that the defendants are not entitled to qualified immunity.  See Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (internal quotation marks omitted); see also Gonzalez, 325 F.3d at 1234 ("Once the defendants have established that they were acting

17

within their discretionary authority, the burden shifts to the plaintiff[] to show that qualified immunity is not appropriate.").  To meet his burden, plaintiff Caldwell must prove both that "(1) the defendants violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Hollman ex rel. Hollman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).  We address each prong of the qualified immunity analysis below.

## VI.  EIGHTH AMENDMENT VIOLATION

### A.    Legal Principles

The Eighth Amendment "imposes [a] dut[y] on [prison] officials" to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (quotation marks omitted).  In particular, under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." Id. at 833, 114 S. Ct. at 1976 (citing various courts of appeals) (quotation marks omitted and alterations adopted); Rodriguez, 508 F.3d at 616–17.  "It is not, however, every injury suffered by one inmate at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834, 114 S. Ct. at 1977.

18

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (internal quotation marks omitted) (alterations adopted) (emphasis added); see also Farmer, 511 U.S. at 828, 114 S. Ct. at 1974 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). To survive summary judgment on a deliberate indifference failure-to-protect claim, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted).

When examining the first element—a substantial risk of serious harm—the court uses an objective standard. See Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1028–29 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007). The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." Rodriguez, 508 F.3d at 617 (citing

19

Farmer, 511 U.S. at 829, 837, 844, 114 S. Ct. at 1974, 1979, 1982–83, and other cases) (footnote omitted).  To satisfy the objective component, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner."  Id.

With regard to the subjective component of the second element—i.e., the defendant's actual knowledge that an inmate faced a substantial risk of serious harm—the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837, 114 S. Ct. at 1979.  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Rodriguez, 508 F.3d at 617 (quoting Farmer, 511 U.S. at 842, 114 S. Ct. at 1981) (quotation marks omitted).

## B.    Application to Caldwell's Claim

Plaintiff Caldwell asserts that the three defendants violated his Eighth Amendment right because they allowed Caldwell to be returned to the cell with inmate Pinson despite their knowledge of the substantial safety risk that inmate Pinson posed to Caldwell and without any attempt to minimize that risk.

20

Given inmate Pinson's past prison violence before his SMU transfer, his fire setting, and his violent assault on plaintiff Caldwell—which involved suffocation and bondage and which resulted in head trauma, many contusions and cuts, and possible sexual assault—the defendants do not dispute the first element (i.e., a substantial risk of serious harm) of Caldwell's deliberate indifference claim. See McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983) (noting in the context of a § 1983 action that an allegation of an unjustified serious physical assault against an inmate raises an arguable Eighth Amendment claim).

Moreover, at this summary judgment juncture, the defendants do not dispute the objective component of the second element of Caldwell's claim. That is, the defendants do not dispute that—if they had actual, subjective knowledge that Caldwell faced a substantial risk of serious harm from inmate Pinson—their alleged failure to make any attempt, or take any action, to minimize that risk and their returning Caldwell, almost immediately, back into the locked cell with inmate Pinson was objectively unreasonable. Nor do the defendants dispute that—if they had such subjective knowledge of the risk that Caldwell faced—the third element—causation—is satisfied.

Stated more simply, the only part of plaintiff Caldwell's deliberate indifference claim that the defendants contest is the subjective component of the

21

second element:  whether there is sufficient evidence from which a jury could find that the defendants actually (subjectively) knew that Caldwell faced a substantial risk of serious harm from inmate Pinson.

To evaluate the disputed element of Caldwell's deliberate indifference claim, we first state what the defendants knew (based on the summary judgment evidence, in the light most favorable to plaintiff Caldwell, and the reasonable inferences drawn therefrom):

- During his incarceration at another federal prison, inmate Pinson was very disruptive and had a violent past that resulted in his placement in the SMU.  Inmate Pinson required greater prison management at the SMU to ensure the safety, security, and orderly operation of federal prisons.

- On the morning of September 9, 2009, while inmate Pinson and plaintiff Caldwell were locked in their shared cell, inmate Pinson started a fire in the cell.  Caldwell played no part in starting that fire, and inmate Pinson quickly and freely claimed full responsibility for starting the fire.

- Inmate Pinson used Caldwell's personal photographs and papers when starting the fire.

22

- While the inmates remained in the locked cell, the fire filled the cell with flames and black smoke. Although the fire was concentrated at the door, it had also spread to (or from) the cell's light fixture, sink, and plaintiff Caldwell's personal property.

- The fire was so severe that the flames and firefighting efforts destroyed a large amount of Caldwell's personal property, including his personal photographs, address book, and legal materials.

- After being rescued from his locked, fiery cell, plaintiff Caldwell needed a medical examination to assess his injuries.

- The cell fire threatened plaintiff Caldwell's and inmate Pinson's lives and/or safety.

- After the fire but before he was returned his cell, plaintiff Caldwell told each defendant that he feared that his life would be in danger if he was returned to the cell with inmate Pinson.

- Following inmate Pinson's attack on plaintiff Caldwell, Captain Smith stated in a report that inmate Pinson "was very disruptive" and had "an extensive well documented history of disruptive and assaultive behavior" that was having "a major impact on the orderly running of the Institution as well as the safety of both Staff and inmates."

23

A reasonable jury could infer from these facts that the defendants actually knew that Caldwell faced a substantial risk of serious harm from inmate Pinson. The defendants knew that inmate Pinson had a violent past, was very disruptive, and needed greater management. They knew that inmate Pinson started a dangerous cell fire that endangered his life and Caldwell's life and that Pinson expressed no regret at having endangered Caldwell's life or safety. And, because inmate Pinson used Caldwell's personal photographs and papers to start the fire, the defendants knew that it was possible that inmate Pinson was targeting Caldwell with his unsafe actions. They also knew that Caldwell feared for his life if he was returned to a cell with inmate Pinson. And, a jury could reasonably infer from the facts preceding Caldwell's expression of fear that Caldwell had a well-founded basis for his fear.

The defendants argue that the cell fire was just as likely to harm inmate Pinson as plaintiff Caldwell, and, therefore, the defendants did not have notice that inmate Pinson would try to harm Caldwell specifically. However, the fact that inmate Pinson was willing to put his own life in jeopardy does not diminish the fact that he also jeopardized Caldwell's life by setting the locked cell on fire. Nor does it negate the defendants' knowledge of inmate Pinson's history of violence. And, it does not diminish the reasonable inferences drawn from the fact that inmate

24

Pinson intentionally burned Caldwell's personal effects in the fire.  Those facts, viewed together with Caldwell's repeated statements that he feared (and had reason to fear) for his life if he was locked back in a locked cell with inmate Pinson, are sufficient to allow a jury to infer that the defendants actually knew that Caldwell faced a substantial risk of serious harm if he was returned to a cell with inmate Pinson.  See Farmer, 511 U.S. at 842, 114 S. Ct. at 1981 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").  This is especially true given that the defendants put plaintiff Caldwell back into the cell with inmate Pinson just a few hours after the cell fire was extinguished.

We stress that plaintiff Caldwell must show more than "a generalized awareness of risk" and "much more than mere awareness of Inmate [Pinson's] generally problematic nature."  Carter, 352 F.3d at 1349–50.  But, as explained above, plaintiff Caldwell has done that here.  And, contrary to the defendants' arguments, Caldwell was not required to produce evidence of the precise way that inmate Pinson might harm him in the future.  See Farmer, 511 U.S. at 843, 114 S. Ct. at 1982.

25

Furthermore, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. Thus, a jury need not infer that the defendants intended that inmate Pinson harm Caldwell or that they actually believed that inmate Pinson would harm Caldwell. It is enough that a jury be able to infer from the evidence that the defendants actually knew of a substantial risk that inmate Pinson would seriously harm Caldwell. The summary judgment evidence would allow a jury to draw those inferences and make those findings. Accord Rodriguez, 508 F.3d at 621–22 (concluding that a jury question existed as to the defendant's subjective knowledge of a substantial risk of serious harm to the plaintiff).

Because the record contains sufficient evidence from which a reasonable jury could find the subjective element of Caldwell's Eighth Amendment failure-to-protect claim, the district court erred in granting the defendants' motion for summary judgment on that basis.

26

## VII.  CLEARLY ESTABLISHED LAW

The only remaining issue relevant to the defendants' qualified immunity defense is whether, by September 9, 2009, preexisting law clearly established that the defendants' conduct violated the Eighth Amendment.

In determining whether a right is clearly established, the relevant, dispositive inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Cottone v. Jenne, 326 F.3d 1352, 1359 (11th Cir. 2003) (quotation marks omitted); see also Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).  "In making this inquiry, the salient question is whether the state of the law gave the [defendants] fair warning that their alleged conduct was unconstitutional."  Cottone, 326 F.3d at 1359 (quoting Hope, 536 U.S. at 741, 122 S. Ct. at 2516 (alterations adopted) (quotation marks omitted).

Prior to the conduct in this case, this Court already clarified that a prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or

27

monitor that substantial risk of serious harm.[14]  See, e.g., Cottone, 326 F.3d at 1358–60; Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1584 (11th Cir. 1995); LaMarca v. Turner, 995 F.2d 1526, 1536–38 (11th Cir. 1993).  This Court, in Cottone, held that the total failure to monitor or supervise a visibly violent, mentally unstable, schizophrenic inmate who was housed in a separate unit for mentally ill inmates and who posed a substantial risk of serious harm to other inmates in that housing unit constituted deliberate indifference.  326 F.3d at 1358–59.

Here, similar to the case in Cottone, there was a known, violent inmate (Pinson) who was housed in a separate unit for violent and disruptive inmates and who had already threatened his cellmate's (Caldwell's) safety through the intentional and dangerous act of setting their shared, locked cell on fire.  And, almost immediately after Caldwell was rescued from that fiery cell, Caldwell specifically told the defendants that he feared that his life was in danger if he was returned to the locked cell with inmate Pinson.  Armed with actual, subjective knowledge of inmate Pinson's prior violence before coming to the SMU, inmate Pinson's recent violence against plaintiff Caldwell, and Caldwell's reported fear of being placed in a small, locked cell with inmate Pinson again, the defendants—like

---

[14]Only cases from the United States Supreme Court, this Court, and the highest state court under which the claim arose can clearly establish the law in our Circuit.  Coffin, 642 F.3d at 1013.

28

the defendants in <u>Cottone</u>—took no action.  They did not investigate inmate Pinson's motives; they did not monitor inmate Pinson's actions; they did not search the cell; and they did not take any other action to mitigate the substantial risk of serious harm that inmate Pinson posed to plaintiff Caldwell.  When viewed in plaintiff Caldwell's favor, the facts show that, shortly after extinguishing a sizeable cell fire, the defendants simply locked Caldwell back in the cell with inmate Pinson and walked away.

By the time of the fire and assault in September 2009, the law of this Circuit, as expressed in <u>Cottone</u>, clearly established that the defendants' total failure to investigate—or take any other action to mitigate—the substantial risk of serious harm that inmate Pinson posed to plaintiff Caldwell constituted unconstitutional deliberate indifference to Caldwell's Eighth Amendment rights.  Thus, the defendants are not entitled to qualified immunity at this summary judgment stage.

We have not forgotten that the facts and reasonable inferences set forth and analyzed in this opinion are presented in the light most favorable to plaintiff Caldwell.  We are aware that Caldwell may not be able to prove such facts to the satisfaction of the jury and that the jury may elect not to draw inferences from the circumstantial evidence in Caldwell's favor.  Nevertheless, at this summary

29

judgment stage, and given plaintiff Caldwell's version of the events, the defendants have not shown that they are entitled to qualified immunity.

## VIII.  CONCLUSION

Because the defendants are not entitled to qualified immunity based on the summary judgment evidence, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

Because no discovery beyond initial disclosures has occurred in this case, the district court should permit all parties a reasonable time, of at least 3 months, to conduct discovery.

**VACATED AND REMANDED**.